IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHARLES THORNTON #Y19115,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 19-CV-1371-SMY |
| | ) |
| **WEXFORD HEALTH SOURCES, INC.,** | ) |
| et al, | ) |
| | ) |
| **Defendants.** | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Charles Thornton, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983. He claims the defendants were deliberately indifferent to his serious medical needs at Menard Correctional Center by denying him medical care, allowing LPNs and CMTs to render medical services they are not qualified to provide, and failing to enforce the prison deadlock policy or protocol.

The case is now before the Court for consideration of the motion for summary judgment filed by Defendants Dr. Mohammad Siddiqui, Wexford Health Sources, Inc., and Mary Jo Zimmer (Doc. 209). Plaintiff opposes the motion (Doc. 232). For the following reasons, the motion is **GRANTED** in its entirety.

## Factual Background

The following relevant facts are undisputed unless otherwise noted: prior to his incarceration, Thornton was shot in the face with a handgun (Doc. 232, p. 85 at 44:17-23). The bullet lodged itself against his cervical vertebrae (*Id.*, p. 86 at 43:1-5). The shooting resulted in long-term neck, right shoulder, and nerve pain that occasionally flared up and for which Thornton

received treatment at Menard Correctional Center during the relevant period (*Id.*, p. 88 at 50:1-18).

On April 13, 2018, Thornton met with medical personnel at Menard regarding complaints of pain in his neck that had been recently exacerbated by an inmate chokehold (Doc. 211-1, p. 6; Doc. 232, pp. 15-16 at ¶ 6-11).  The staff member recorded his vital signs, noted that he showed no signs of obvious discomfort, and directed him to return to the Healthcare Unit ("HCU") if his symptoms worsened (Doc. 211-1, p. 6).  According to Thornton, during this visit, he met with a "Jane Doe" who "was unqualified and did not have the educational preparation or scope of practice to examine patients" (Declaration of Charles Thornton, Doc. 232, p. 17 at ¶ 14).  Thornton asked for, but did not receive, a "stronger dosage of his prescribed medication" (*Id.* at p. 16 at ¶ 9).

Thornton received a sick call pass to see Dr. Siddiqui on June 11, 2018, but did not attend the appointment because a correctional officer did not honor his pass (*Id.* at pp. 18-19 at ¶¶ 23-25).  The Menard medical note states, "Not seen due to [inmate] refused.  Signed refused in chart" (Doc. 211-1, p. 7).

On July 29, 2018, Thornton refused to submit to a mouth check to ensure that he had taken his medication.  (*Id.*)  The administration of his medication had changed to a crush and float matter.  (*Id.*)

On August 3, 2018, Thornton refused to take his medication as administered in a crush and float manner, stating, "I'm not taking it like that" (*Id.* at p. 8).  Thornton again refused to take his medication in a crush and float manner on August 5, August 7, and August 8, 2028 (*Id.* at p. 9).

On August 8, 2018, Thornton presented to the HCU and spoke with a nurse about being administered his medication in a crush and float manner (*Id.* at p. 10).  The nurse noted, "Angry about meds being crushed and floated . . . [Thornton] refused to discuss medical problems, just

kept repeating over and over who he was suing . . . argumentative and just kept saying, 'I'll see you in court!'" (*Id.*)  According to Thornton, the nurse "became very irate with [him] then threw him out of the sick call" after he complained of "constant pain in the inside of his neck" (Declaration of Charles Thornton, Doc. 232, p. 20 at ¶ 28).

On August 9, 2018, Thornton met with Nurse Zimmer.  During his deposition, Thornton testified that he initially told Zimmer that his pain medication was either not working or the method of administering it (a crush and float form) was ineffective and asked her for a higher dosage (Doc. 211-2, p. 5 at 154:20-25).  Due to pain from his bullet injury, he asked Nurse Zimmer to look into whether he needed a variation in his pain medication.  (*Id.*, p. 6 at 155:14-20).  Nurse Zimmer refused to provide him with pain medication, did not issue him a permit for a front cuff, and threatened him with a disciplinary ticket (Doc. 232, p. 20 at ¶ 31).  Zimmer's medical notes from the appointment indicate that Thornton refused his medications, worried about being poisoned by the nursing staff, and became hostile (Doc. 211-1, p. 11).

Dr. Siddiqui did not treat Thornton but responded to several of his grievances (Doc. 232, p. 10).  In grievance # 467-4-18, Thornton complained about his April 13, 2018 appointment, stating that he wants to know "why [he has] been denied adequate medical treatment for so long and to see a doctor immediately" (Doc. 211-3, p. 19).  In a subsequent memorandum, Dr. Siddiqui noted that he had reviewed the medical record and grievance and concluded that, "The medical co-pay of $5.00 was charged correctly and does not mean you will automatically be referred to the MD.  The nurse instructed [Thornton] on 4/13/2018 to return to see the provider if symptoms worsen or interfere with daily functioning.  No further sick call has been submitted." (*Id.* at pp. 19, 22).

In grievance # 2-5-18, Thornton complained about a shakedown on April 26, 2018, when

he was instructed to keep his head lowered and denied front cuffing. (*Id.* at p. 15). Dr. Siddiqui reviewed the grievance and indicated that Thornton had no "alternate cuffing permit," and that he had refused to be treated by Dr. Siddiqui on June 11, 2018. (*Id.*)

In grievances # 325-6-18 and # 11-7-18, Thornton complained that he had a medical pass from June 11, 2018 that had not been honored. (*Id.* at pp. 8-13). Dr. Siddiqui reviewed the grievance # 325-6-18 with a nursing supervisor and determined that, "Nothing noted to substantiate offender grievance other than he refused his pass on 6-11-18. Proper procedure is to honor call passes for medical." (*Id.* at p. 8). Grievance # 11-7-18, was later denied as moot because it was a duplicate of # 325-8-18. (*Id.* at p. 11).

In grievance # 252-8-18, Thornton complained of a sick call on August 8, 2018 and an appointment with Nurse Zimmer on August 9, 2018. (*Id.* at p. 4). Dr. Siddiqui noted, "The progress note states offender was seen for neck pain, and offender was angry and argumentative; she attempted to discuss his situation but offender kept saying I'll see you in court. Offender was referred to MD/NP to discuss concerns. On 8-9-18 offender was seen by the NP, where offender became hostile and kept interrupting the NP and the visit was terminated." (*Id.* at p. 4).

In grievance # 341-2-18, Thornton complained that he had been harassed by a member of the medical staff who had made him "open his mouth wide and stretch his tongue up and down and side-to-side." (*Id.* at p. 24). Although Dr. Siddiqui is not named, the Grievance Office reviewed and determine that the "Healthcare Unit responded appropriately." (*Id.*)

## Discussion

Thornton filed the instant lawsuit pursuant to 42 U.S.C. § 1983 (Doc. 1). Following the initial screening, motions to amend the complaint, and a settlement with many of the defendants, Thornton is proceeding on the following claims:

> Count 4: Eighth Amendment deliberate indifference to serious medical needs claim against Defendant Nurse Practitioner Zimmer for denying Plaintiff medical care on August 9, 2018;
>
> Count 5: Eighth Amendment deliberate indifference to serious medical needs claim against Defendants Wexford for its policy and/or custom of permitting unqualified medical personnel to perform licensed professional's duties and/or allowing LPNs and CMTs to render medical services they are not qualified to provide.
>
> Count 6: Eighth Amendment deliberate indifference to serious medical needs claim against Defendant Dr. Siddiqui for allowing LPNs and CMTs to render medical services they are not qualified to provide.
>
> Count 7: Eighth Amendment deliberate indifference to serious medical needs claim against Defendants Wexford and Dr. Siddiqui for the failure to enforce the prison deadlock policy or protocol.
>
> Count 9: Eighth Amendment claim against Defendant Dr. Siddiqui for deliberate indifference to Plaintiff's serious medical needs.

(Doc. 55, pp. 7-8).

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue as to any material fact — that is where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners. *Machicote v. Roethlisberger,* 969 F.3d 822, 827 (7th Cir. 2020) (citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). To prevail on a claim for deliberate indifference to a serious medical need, a plaintiff must first demonstrate that they suffered from an objectively serious

medical condition. *Dunigan ex rel. Nyman v. Winnebago Cnty.,* 165 F.3d 587, 590-592 (7th Cir. 1999). Second, the plaintiff must establish that the defendant actually knew of and disregarded a substantial risk of harm. *Murphy v. Wexford Health Sources Inc.,* 962 F.3d 911, 915 (7th Cir. 2020).

"An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir. 2012). Thornton's testimony regarding intermittent neck and shoulder pain from a decade-old injury does not support a finding of a diagnosed medical condition mandating treatment, or a need for medical attention that a lay person would recognize. And even if Thornton's neck and shoulder pain was a chronic or degenerative condition, to qualify as an objectively serious condition it must have been able to cause "harm that may escalate and have significant future repercussions unless adequately treated." *McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016) (discussing high cholesterol as such a condition that can "progress over an extended period without apparent side effects before eventually reaching a crisis point"). Thornton has neither established that his neck pain could escalate nor that it poses some future risk of becoming a serious medical issue.[1] Moreover, based on the evidence on record, no reasonable jury could conclude that Defendants acted with deliberate indifference to Thornton's medical needs.

---

[1] Thornton requests that this Court take judicial notice of two cases in the Northern District of Illinois that found he had an objectively serious medical condition, but they only found he had an objectively serious condition after sustaining another injury. *Thornton v. Dr. Baker*, 13-cv-8029, ECF No. 126, pg. 6 (N.D. Ill. Aug. 24, 2016) ("plaintiff suffered a serious medical condition after the July 18, 2012 fall [a slip and fall] to create a genuine issue of fact"); *Thornton v. Dr. Baker*, 14-cv-6477, ECF No. 98, p. 4 (N.D. Ill. Aug. 24, 2016) ("Plaintiff asserted that he was pushed to the ground during a fight and injured"). Neither case resulted in a finding that his decade-old bullet injury was, by itself, an objectively serious condition.

**Mary Jo Zimmer, LPN**

Thornton alleges that Nurse Zimmer was deliberately indifferent to his needs by denying him medical care on August 9, 2018, which was Thornton's only appointment with Zimmer. Nurse Zimmer's alleged refusal to provide Thornton with additional or modified pain medication cannot support a finding of deliberate indifference as Thornton has not established a medical need for such medication aside from his own preferences. *Forbes v. Edgar*, 112 F.3d 262, 266–67 (7th Cir. 1997) (Eighth Amendment does not mandate that providers offer specific treatment or the treatment of Plaintiff's choice). And even crediting Thornton's testimony that Nurse Zimmer did not issue a front cuff permit to him as requested, there is no evidence establishing the front cuff was medically necessary or that Nurse Zimmer was responsible for issuing such permits in Menard Correctional Center.

**Wexford Health Sources, Inc.**

Thornton claims that Wexford violated the Eighth Amendment by allowing unqualified medical personnel to perform licensed professional's duties and/or allowing LPNs and CMTs to render medical services they are not qualified to provide, and by failing to enforce the prison deadlock policy or protocol. Thornton's claim against Wexford for hiring unqualified professionals is based on part on the Illinois Nurse Practice Act, 225 ILCS § 65/50-10 ("the Nurse Act"). Although Thornton could not identify any specific violation of the Nurse Act, he alleges that the report in *Lippert v. Baldwin* outlined a violation of it. *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *1 (N.D. Ill. Apr. 28, 2017) (referencing the report of a court-appointed medical expert, Dr. Ronald Shansky). Thornton attaches several pages of the report that detail an investigation that occurred at Menard between May 21 to May 25, 2018 (Doc. 232, p. 104). The investigation did find "systematic issues that present ongoing risk of harm to patients" and an

"extraordinary number of vacancies" but the excerpt that Thornton attaches does not reference the Nurse Act. (*Id.*)

The Nurse Act generally prohibits any unlicensed person from engaging in the practice of nursing. 225 ILCS § 65/50-50(a) ("No person shall . . . (2) Practice professional nursing without a valid license as a registered professional nurse"). However, the Nurse Act authorizes delegating nursing interventions to other unlicensed personnel based on a number of factors, including the stability and condition of the patient, the potential for harm, and the complexity of the nursing intervention. 225 ILCS § 65/50-75(b)(1). The Nurse Act defines a "Nursing Intervention" as, "any treatment based on clinical nursing judgment or knowledge that a nurse performs." 225 ILCS § 65/50-10. Plaintiff alleges that these other individuals are not qualified to perform medical assessments and formulate treatment plans without the supervision of a registered nurse" (Doc. 55, pg. 6).

The above exceptions in the Nurse Act permit unlicensed medical personnel to work in medical environments if the delegation of the tasks satisfies the factors outlined in the Nurse Act. 225 ILCS § 65/50-75(b)(1). Even if Thornton is correct that there were unlicensed nurses practicing at Menard, the Nurse Act is clear that "delegation" is not synonymous with "oversight": "'Delegation' means transferring to a specific individual the authority to perform a specific nursing intervention in a specific situation." 225 ILCS § 65/50-75(a). Thornton has not shown that any such persons were working completely independently or that any delegations were improper, in violation of the Nurse Act. More importantly, Thornton has not shown that he was treated by any independent and unlicensed personnel on the dates at issue, or that it personally caused him harm. *Higgason v. Farley,* 83 F.3d 807, 810 (7th Cir. 1996) (plaintiffs lack standing in §1983 actions where they allege that the constitutional rights of other inmates were violated, but not that their

individual rights were violated). Thornton only alleges that he met a Jane Doe who was "unqualified" to treat him but fails to substantiate these allegations or show how they affected his treatment (Doc. 232, pp. 16-17 at ¶¶ 9-14).

Thornton's claim against Wexford for allegedly hiring unqualified professionals fails to meet the *Monell* standard as well. A private corporation that has contracted to provide essential government services is subject to liability under Section 1983. *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978). But to succeed on a *Monell* claim, the plaintiff must "show a direct causal connection between the policy or practice and his injury." *Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 675 (7th Cir. 2012). Thornton has not shown that any policy or practice of hiring unqualified professionals related to his neck pain.

Thornton also claims that Wexford's failure to implement a deadlock policy (locking his cell so that other inmates could not access it) constitutes deliberate indifference. To state a failure to protect claim, a prisoner must allege that (1) he is incarcerated under conditions posing a substantial risk of serious harm, and (2) the defendant(s) acted with deliberate indifference to that risk. *Brown v. Budz,* 398 F.3d 904, 909 (7th Cir. 2005). "'Deliberate indifference' . . . is merely a synonym for intentional or criminally reckless conduct," or "conduct 'that reflects complete indifference to risk — when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death.'" *Salazar v. City of Chicago,* 940 F.2d 233, 238 (7th Cir. 1991). To find deliberate indifference, there must be "substantial indifference in the individual case, indicating more than mere negligent or isolated occurrences of neglect." *Gutierrez v. Peters,* 111 F.3d 1364, 1375 (7th Cir. 1997). Therefore, "[a] finding that a defendant's neglect of a prisoner's condition was an isolated occurrence . . . . to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference." *Id.*

Here, Thornton failed to proffer evidence that there was any reason for his cell to be deadlocked, much less that any alleged failure by Wexford constituted deliberate indifference to any risk to his person. As such, Wexford will be granted summary judgment on this basis as well.

### Dr. Mohammad Siddiqui

For the reasons stated above, Dr. Siddiqui is also entitled to summary judgment on Thornton's Eighth Amendment claims for (1) allowing unqualified medical personnel to perform licensed professional's duties and/or allowing LPNs and CMTs to render medical services they are not qualified to provide, and for (2) failing to enforce the prison deadlock policy or protocol. Although Dr. Siddiqui was a medical director for the Menard facility, there is no evidence that he was involved in any policy to improperly staff the facility or failing to enforce a deadlock policy.

The only remaining claim against Dr. Siddiqui is deliberate indifference to Thornton's medical issues. Because Dr. Siddiqui never treated Thornton directly, deliberate indifference can only arise from Dr. Siddiqui's responses to Thornton's various grievances. While Thornton may disagree with Dr. Siddiqui's responses, he answered every grievance with responses evidencing his medical and professional judgments. And although Thornton argues that Dr. Siddiqui ignored his complaints of constant pain, there is no evidence of this in the record. Thornton was consistently offered pain medication in the crush and float manner. Thornton asserts that Dr. Siddiqui should have done more to treat his condition, he has provided no evidence to support this vague assertion. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("Constitution is not a medical code that mandates specific medical treatment").

### Conclusion

For the foregoing reasons, Defendants Dr. Mohammad Siddiqui, Wexford Health Sources, Inc., and Mary Jo Zimmer's Motion for Summary Judgment (Doc. 209) is **GRANTED**. As no

claims remain, the Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED: March 31, 2024**

**STACI M. YANDLE**
**United States District Judge**